OLSEN, Plaintiff and Appellant, v. MOORE and others, Defendants and Respondents: JANIKOWSKI and another, Defendants. [Case No. 119.]

URBAN and husband, Plaintiffs and Appellants, v. BADGER STATE MUTUAL CASUALTY COMPANY and others, Defendants and Respondents: RAUWALD and another, Defendants: CHARLES MAIER & SON COMPANY, Impleaded Defendant and Respondent. [Case No. 120.]

BORMAN, Individually and as Administratrix, Plaintiff and Appellant, v. MOORE and others, Defendants and Respondents: JANIKOWSKI and another, Defendants. [Case No. 121.]

JANIKOWSKI, Plaintiff and Appellant, v. MOORE and another, Defendants and Respondents. [Case No. 122.]

RAUWALD, Plaintiff and Appellant, v. BADGER STATE MUTUAL CASUALTY COMPANY and another, Defendants and Respondents. [Case No. 123.]

*Nos. 119–123. Argued October 30, 1972.—Decided November 28, 1972.*
(Also reported in 202 N. W. 2d 236.)

342

For the appellants there was a brief by *Erbstoeszer, Cleary & Zabel* of Milwaukee, attorneys for Gordon Olsen, *Ray T. McCann* of Milwaukee, attorney for Betty M. Urban and Earle H. Urban, *Leonard L. Loeb* of Milwaukee, of counsel, *Dahms & Brewer* of Oconomowoc, attorneys for Betty L. Bormann, *Herro, Snyder, Chapman & Snyder* of Oconomowoc, attorneys for Bruno Janikowski, and *Gibbs, Roper & Fifield* of Milwaukee, attorneys for Nancy L. Rauwald, and oral argument for Gordon Olsen by *Patrick T. McMahon* of Milwaukee.

For the defendants-respondents Thomas Moore and Badger State Mutual Casualty Company there was a brief by *Borgelt, Powell, Peterson & Frauen*, attorneys, and *Kurt H. Frauen* and *Richard D. Hicks* of counsel, all of Milwaukee, and oral argument for defendant-respondent Badger State Mutual Casualty Company by *Kurt H. Frauen.*

For the defendant-respondent Charles Maier & Son Company there was a brief by *Arnold, Murray & O'Neill* of Milwaukee, and oral argument by *James T. Murray.*

WILKIE, J.   Two issues are raised on this appeal:

1. Was the impact between the Moore automobile and the Rauwald automobile a separate "occurrence" from the impact between the Moore and Janikowski autos within the terms of the policy of insurance?

2. As a matter of law, was Thomas Moore acting within the scope of his employment at the time of this incident?

1. *One v. two "occurrences."* The contract of insurance issued by Badger State Mutual Casualty Company provided the following limits of liability in its declarations:

| "Premiums | Limits of Liability | Coverages |
|---|---|---|
| $22.50 | ($10,000.00 each person | Bodily injury liability |
| | ($20,000.00 each occurrence | Bodily injury liability |
| $12.50 | $10,000.00 each occurrence | Property damage liability" |

Although the word "occurrence" is not defined in the policy, the limits of the company's liability are elaborated upon:

"**Limits of Liability.** The limit of bodily injury liability stated in the declarations as applicable to 'each person' is the limit of the company's liability for all damages, including damages for care and loss of services, arising out of bodily injury sustained by one person as the result of any one occurrence; the limit of such liability stated in the declarations as applicable to 'each occurrence' is, subject to the above provision respecting each person, the total limit of the company's liability for all such damages arising out of bodily injury sustained by two or more persons as the result of any one occurrence."

Appellants' essential position is that Thomas Moore's negligent driving resulted in two accidents or "occurrences" rather than one. Appellants submit one occurrence or collision occurred when the Moore auto hit the Rauwald auto and another separate and distinct occurrence resulted when the Moore automobile collided with the Janikowski auto. This would result in raising Badger State Mutual's maximum exposure to $40,000.

The question of whether a collision of one automobile with two or more other automobiles constitutes one or several accidents or occurrences has not before been decided by this court.[2] The problem has been dealt with

---

[2] This court has, however, defined the concept of a cause of action: *"The operative facts, not the consequences, are determinative of a cause of action. . . .*

in several other jurisdictions. There is a split in authority on this question which the commentators say is due to a split in the theoretical approach of viewing the problem.[3] "An influential majority" of jurisdictions have utilized what has come to be known as the "cause theory" approach in analyzing whether one or more accidents or occurrences have occurred.[4] This approach was initially adopted in this country in *Hyer v. Inter-Insurance Exchange*,[5] and is best summarized in *Truck Insurance Exchange v. Rohde*,[6] involving an auto driving on the wrong side of a highway and successively hitting, with individual "thuds," three motorcyclists. In *Truck Insurance Exchange v. Rohde* the Washington Supreme Court held only one accident or occurrence had occurred and stated:

". . . Proximate cause is an integral part of any interpretation of the words 'accident' or 'occurrence' as used in a contract for liability insurance which indemnifies the insured for his tortious acts. . . .

". . .

". . . There was but one proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damage. We are of the opinion that the contract contemplated that the terms, 'accident' and 'occurrence,'

"Applying these concepts, a cause of action must be viewed as a grouping of facts falling into a single unit or occurrence as a lay person would view them. This grouping of facts consists of 'the defendant's wrongful act.'" (Emphasis supplied.) The court went on to hold joinder of causes of action was not proper where the two accidents contributing to plaintiff's injuries occurred over five months apart. *See Caygill v. Ipsen* (1965), 27 Wis. 2d 578, 582, 135 N. W. 2d 284. *See also: Fitzwilliams v. O'Shaughnessy* (1968), 40 Wis. 2d 123, 161 N. W. 2d 242.

[3] Annot. (1957), 55 A. L. R. 2d 1300; 15 Couch, *Insurance* (2d ed.), p. 696, sec. 56:20.

[4] 1 Long, *Law of Liability Insurance*, sec. 2.11 at 2–20.

[5] (1926), 77 Cal. App. 343, 246 Pac. 1055.

[6] (1956), 49 Wash. 2d 465, 303 Pac. 2d 659, 55 A. L. R. 2d 1288.

included all injuries or damage within the scope of the single proximate cause. . . ." [7]

A like result also occurred in *Saint Paul-Mercury Indemnity Co. v. Rutland,*[8] wherein a truck collided with a train causing its derailment and damage to 16 railroad cars belonging to 14 different owners, their contents and the railroad company roadbed. The Fifth Circuit Court of Appeals had initially sustained the insured's contention that there were as many accidents as insureds.[9] After motion for reargument was granted a new panel of judges reversed the original decision and stated:

"The only limit expressed in the policy for automobile property damage liability is the disputed phrase '$5,000.00 each accident.' It can hardly be denied that when ordinary people speak of an 'accident' in the usual sense, they are referring to a single, sudden, unintentional occurrence. They normally use the word 'accident' to describe the *event,* no matter how many persons or things are involved.

". . .

". . . we think it clear that the word 'accident' as used in the disputed phrase was intended to be construed from the point of view of the cause rather than the effect." [10]

A small number of jurisdictions subscribe to the "effect theory" of liability. The origin of this view of the words occurrence or accident is found in an early English

[7] *Id.* at page 471.

[8] (5th Cir. 1955), 225 Fed. 2d 689.

[9] The original case was recalled and, hence, can only be found in the Federal Reporter advance sheets, 217 Fed. 2d 585; *cf.* 1 Long, *Law of Liability Insurance, supra,* footnote 4, at 2–25.

[10] *Saint Paul-Mercury Indemnity Co. v. Rutland, supra,* footnote 8, at pages 691, 692. *See also: Tri-State Roofing Co. v. New Amsterdam Casualty Co.* (D. C. Pa. 1955), 139 Fed. Supp. 193; *Denham v. La Salle-Madison Hotel Co.* (7th Cir. 1948), 168 Fed. 2d 576.

case, *South Staffordshire Tramways Co. v. Sickness & Accident Assurance Asso. Ltd.*,[11] wherein it was contended that each injury caused to a passenger on a tramcar which overturned constituted one accident. In this case the court stated:

". . . If several persons were injured, I think, upon the true construction of this policy, there were several accidents." [12]

This holding was first adopted in this country in a decision of the Federal Court of Appeals for the Fifth Circuit, *Anchor Casualty Co. v. McCaleb*,[13] and subsequently in several other jurisdictions.[14] None of these cases involves automobile accidents. *Anchor Casualty* involved a blown oil well which caused eruptions intermittently over two days. Each eruption caused quantities of oil, gas distillate, sand and mud to be deposited on the property of surrounding land owners. The court of appeals held that the term "each accident" was to be viewed from the point of view of the person whose property was injured. The court in *Anchor* extensively relied upon the definition of "accident" found in Bouvier's, *Law Dictionary*, which defines an accident as an event which " 'is unusual and unexpected by the person to whom it happens.' "[15]

At least one author regards this theory as falsely premised. It is suggested in Long's treatise on liability insurance that courts must look at the policy's provision relating to the upper limits of liability (". . . the total

---

[11] 1 Law Reports 402 (Q. B. 1891).

[12] *Id.* at page 407.

[13] (5th Cir. 1949), 178 Fed. 2d 322.

[14] *Pennsylvania Home Improvement Co. v. American Casualty Co.* (1955), 4 Pa. D. & C. 2d 516, 47 Berks County L. J. 285; *Kuhn's of Brownsville v. Bituminous Casualty Co.* (1954), 197 Tenn. (1 McCanless) 60, 270 S. W. 2d 358.

[15] *Anchor Casualty Co. v. McCaleb, supra,* footnote 13, at page 324.

limit of the company's liability for all such damages arising out of bodily injury sustained by two or more persons as the result of any one occurrence." *See,* page 345, *supra*). According to Long, it is "unparalleled nonsense" to assert that two or more persons might ever be injured in one accident if each injury equals one accident.[16]

The issue thus before this court is whether an "accident" or "occurrence" in a liability insurance policy providing stated limits of liability "per accident" or "per occurrence," should be viewed from the perspective of *cause* or *effect*. If viewed from the point of view of a cause, it would appear that a single, uninterrupted cause which results in a number of injuries or separate instances of property damage is yet one "accident" or "occurrence." If, however, that cause is interrupted or replaced by another cause the chain of causation is broken and more than one accident or occurrence has taken place. *Liberty Mut. Ins. Co. v. Rawls*,[17] a case cited by appellants for their proposition that two rather than one accident occurred herein, fits into the cause theory of liability. The Fifth Circuit Court of Appeals in *Rawls* did find that two accidents had occurred when the insured's vehicle struck two successive automobiles. The reason two accidents occurred was due to the fact that the insured had not lost control of his vehicle after he hit the first auto. He had been traveling at a high rate of speed and was being pursued by two deputy sheriffs. After striking the first auto, the insured continued for approximately 30 to 300 feet and two to five seconds. While the insured's auto veered across the median strip and struck the second vehicle head on, the court found no evidence that the insured had ever lost

---

[16] 1 Long, *Law of Liability Insurance, supra,* footnote 4, at page 2–31.

[17] (5th Cir. 1968), 404 Fed. 2d 880.

control. The court noted, in concluding, that such a result could have been reached under either the cause theory or the effect theory.

The facts here are distinctly different from those in *Rawls*. Here Thomas Moore's vehicle struck both vehicles almost instantaneously. Witness Robert Perlick testified that he was in a car approximately six car lengths behind the Rauwald and Janikowski automobiles. He testified to the effect that the Moore auto crossed over the median strip, over the left lane and struck the first auto in the right lane; that the Rauwald auto was thrown into the ditch and the Moore car was deflected into the high-speed lane where it collided with the second (Janikowski) auto. On cross-examination Perlick testified that the collisions occurred almost instantaneously. According to Perlick, the whole incident occurred in less than a second. There was also testimony by defendant Thomas Moore that he remembered nothing of the accident:

"I remember making a turn off onto Highway I-94, I remember passing a car, I remember rolling up the window so the wind wouldn't blow in, and I proceeded down the highway and that's the last I remember."

There was virtually no time or space interval between the two impacts. Moore never regained his control over the automobile prior to striking the second car as did the driver in *Rawls*. Viewed from the standpoint of the "cause theory" the situation here clearly would result in but one accident or occurrence.

The term "accident" has been defined in a workmen's compensation case as "a fortuitous event, unexpected and unforeseen by the injured person," [18] and, therefore, the term "accident" in these industrial cases is viewed from the perspective of the injured person. The distinction, of course, is that workmen's compensation is

[18] *Semons Department Store v. ILHR Department* (1971), 50 Wis. 2d 518, 523, 184 N. W. 2d 871.

an insurance for the benefit of the insured—the injured person. Here, however, the liability insurance policy was not purchased to insure the injured plaintiffs but to give liability protection to the defendant—Thomas Moore. Among other reasons, this leads us to reject the "effect theory" in defining the term "occurrence."

Appellants further contend that the policy language is ambiguous and should, therefore, be construed against the insurer. But such rule of construction is not applicable unless there is ambiguity.[19] There is none here.

Furthermore, it has often been noted that no essential difference exists between the words "accident" and "occurrence."[20] The close parallel between these words is noted in *Truck Insurance Exchange v. Rohde,*[21] wherein it was held:

". . . However, in our opinion and for the purposes of this case, the terms, 'accident' and 'occurrence,' are synonymous."[22]

2. *Scope of employment.* Appellants' second issue is whether Thomas Moore was acting within the scope of his employment at the time when he was driving and caused injuries. Appellants argue that because Moore's employer was required, by its contract with the painters'

[19] *Leatherman v. American Family Mut. Ins. Co.* (1971), 52 Wis. 2d 644, 649, 650, 190 N. W. 2d 904. *See also: Westerman v. Richardson* (1969), 43 Wis. 2d 587, 591, 168 N. W. 2d 851.

[20] Annot. (1957), 55 A. L. R. 2d 1300, 1301.

[21] *Supra,* footnote 6.

[22] *Id.* at page 469. *See also: Aerial Agricultural Service of Montana, Inc. v. Till* (D. C. Miss. 1962), 207 Fed. Supp. 50, 57, 58. ". . . To begin with, the word 'occurrence,' to the lay mind, as well as to the judicial mind, has a meaning much broader than the word 'accident.' As these words are generally understood, accident means something that must have come about or happened in a certain way, while occurrence means something that happened or came about in any way. Thus *accident* is a special type of *occurrence,* but occurrence goes beyond such special confines and, while including accident, it encompasses many other situations as well."

union to which Moore belonged, to pay him 25 cents per hour above scale for transportation purposes, it provided him with transportation. Appellants assert that the law of this state mandates the liability of the employer for negligence occurring during the transportation provided for Moore. Appellants also argue that since Moore was carrying his employer's equipment back to the employer's base of operations this indicates that the trip was for the employer's benefit and, hence, the employer should be liable for any negligence occurring during the trip. Appellants finally argue that because Moore, by contract, had to be paid on the day of the accident, his trip to Lillian's Tap to collect that check indicates that he was still in the course of his employment.

Appellants' contention that, due to the contractual requirement of the employer to pay its employees 25 cents per hour more for transportation costs, such employer is liable for the employee's negligent driving, is falsely premised. Assuming that paying 25 cents extra per hour to defray an employee's transportation costs amounts to providing transportation for employees, as was the determinative question in the cases appellants cite,[23] appellants ignore recent cases which require the further element of *control* over an employee's driving. Thus, for example, in *Strack v. Strack*,[24] this court held a farm employee, who was offered free transportation

[23] *Rock County v. Industrial Comm.* (1924), 185 Wis. 134, 200 N. W. 657; *Geldnich. v. Burg* (1930), 202 Wis. 209, 231 N. W. 624. In both of these cases wherein the employer was held liable for injuries to an employee, the employer either actually provided transportation or directed the injured employee to ride with another employee. *Geldnich* acknowledges that an employer who allows, by contract, employees to use their own vehicles to get to and from work is not thereby liable for injuries occurring to the employee. An added element of pursuing the employer's business was required to predicate liability to the employer.

[24] (1961), 12 Wis. 2d 537, 107 N. W. 2d 632.

but declined and used his own vehicle to get to and from work, was responsible for his own negligent driving. In reaching this result we relied on the Restatement 1 *Agency* 2d, comment *b*, p. 530, sec. 239:

" 'The master may authorize the use of a particular instrumentality without assuming control over its use as a master. The fact that he does not own it or has not rented it upon such terms that he can direct the manner in which it may be used indicates that the servant is to have a free hand in its use. If so, its control by the servant, although upon his master's business, is not within the scope of the employment.' " [25]

Also illuminating with regard to appellants' argument that Moore was provided with transportation and their argument that Moore was furthering his employer's business by carrying the tools back to home base is this court's favorable reference to one of the Restatement's illustrations to this comment:

" 'The master agrees with A, his servant, to pay for A's transportation upon public vehicles such as railway trains and streetcars. As an alternative, A is permitted to use his own automobile for transportation, charging to the master the regular train fare. A is paid by the week, with indefinite hours of labor. In going to a place at which he is to perform work for the master, A drives his own car, carrying thereon necessary tools and materials belonging to the master. In the absence of evidence that A owes P any duty of obedience in the details of operating the automobile, such driving is not within the scope of employment.' " [26]

We are satisfied, therefore, that merely by paying transportation costs the employer here did not have sufficient control over the Moore vehicle on which to predicate its liability for Moore's negligence. Precisely refuting appellants' argument that compensation equals

[25] *Id.* at page 541.
[26] *Id.* at page 542.

liability of an employer is *Kamp v. Curtis*,[27] wherein this court recently reiterated the right-to-control test and stated:

". . . Such reimbursement [for the cost of traveling from a former home to Omaha], however, did not grant nor did Ford, Bacon & Davis exercise any *control* over the method or route of Curtis' travel." (Emphasis supplied.)

Appellants argue that Moore's returning his employer's tools and drywall material to the company yard indicates that he was yet within the employment scope.[28] The record manifestly refutes such contention:

"*Q.* Now, when you were driving your car after loading it, where were you going? *A.* I was going to Milwaukee.

"*Q.* Specifically where were you going to go? *A.* I was going to Lillian's Tap.

". . .

"*Q.* And you were returning your employer's equipment to your employer on August 4, 1965, when this accident happened; is that correct? *A.* No, sir.

"*Q.* Were you going to keep it yourself? *A.* Yes, sir.

"*Q.* And you were going to take it home? *A.* No, sir.

"*Q.* You were eventually going to return it to your employer, weren't you? *A.* Yes, sir.

". . .

"*Q.* And you finished [work] sometime after 4:30 and then you went over to Zigg to have a couple of beers to relax? *A.* Yes, sir.

"*Q.* After when you left Zigg, you were already aware of the fact you couldn't possibly get back to Maier's by 5:00 o'clock [the yard's closing time]; isn't that correct? *A.* I knew I would never—I can't, if you don't leave at 4:30 on the head you will never make it.

"*Q.* You had no intention then, Mr. Moore, of trying to get to Charles Maier and Sons Company with anything

[27] (1970), 46 Wis. 2d 423, 431, 175 N. W. 2d 267.
[28] *James v. Tobin-Sutton Co.* (1923), 182 Wis. 36, 195 N. W. 848; *Eckel v. Richter* (1926), 191 Wis. 409, 211 N. W. 158. These cases propound the general master-servant rule of this state.

that you had in your car that night? *A.* No, sir, I had no intention of going to the shop whatsoever."

To argue, as do appellants, that Moore, merely by loading his car with his employer's tools and drywall, subjected Charles Maier & Son Company to liability for his negligence is to argue that an employer will always be liable where he permits employees to carry company owned tools and goods—regardless of the lack of control over the movements of an employee by the employer.

Appellants' final contention is that Moore was returning to Lillian's Tap in Milwaukee to obtain his paycheck from the company foreman which, pursuant to the employment contract, had to be presented to employees every Wednesday. The record indicates, however, that this rendezvous at Lillian's was a regular Wednesday evening feature for Moore and his friend Alvin Knecht, the company foreman, regardless of whether a paycheck exchanged hands.

Again, assuming Moore was returning to Milwaukee solely to pick up his paycheck from his employer, Wisconsin case law mandates the presence of the element of control in order to predicate an employee's negligence to an employer.[29] Here, as in *Kamp v. Curtis,* Thomas Moore "was free to use his own instrumentality and to choose his own route of travel free from any supervision or control"[30] of his employer, Charles Maier & Son Company.

*By the Court.*—Judgments affirmed.

---

[29] *Kamp v. Curtis, supra,* footnote 27, at pages 430, 431.
[30] *Id.* at page 432.