(93-CV-009620) Jane DeRuyter, Jason DeRuyter and Travis DeRuyter, By Donald J. Jacquart, Their Guardian Ad Litem and the Estate of Glenn R. DeRuyter, By Eric E. Eberhardt, Special Administrator of the Estate of Glenn R. DeRuyter, Plaintiffs-Respondents,

v.

Wisconsin Electric Power Company, Defendant-Appellant,

American Standard Insurance Company, Michael T. Schmaling, Great West Casualty Company, Inc. and Employers Insurance of Wausau, a Mutual Company, Defendants-Respondents.

Great West Casualty Company, Inc., JJ Transport, Inc., Power Transport, Inc., and Cedarland Trucking, Inc., Plaintiffs-Respondents,†

v.

Wisconsin Electric Power Company, Defendant-Appellant,

American Standard Insurance Company of Wisconsin and Michael T. Schmaling, Defendants-Respondents.

Court of Appeals

*No. 94–1991. Submitted on briefs May 3, 1995.—Decided February 27, 1996.*

(Also reported in 546 N.W.2d 534.)

---

†Petition to review granted.

353

For defendant-appellant Wisconsin Electric Power Company the cause was submitted on the briefs of *Jeffrey Morris* of *Quarles & Brady* of Milwaukee.

For the plaintiffs-respondents the cause was submitted on the briefs of *David P. Lowe* and *Donald J. Jacquart* of *Jacquart & Lowe, S.C.*, of Milwaukee, and *Michael P. Crooks* of *Peterson, Johnson & Murray, S.C.*, of Madison.

For defendant-respondent Great West Casualty Company, Inc., the cause was submitted on the briefs of *Douglas J. Carroll* of *O'Neill, Schimmel, Quirk & Carroll, S.C.*, of Milwaukee.

Amicus Curiae brief was filed by *Patrick K. Stevens* of Madison, *Werner E. Scherr* of *Kasdorf, Lewis & Swietlik, S.C.*, of Milwaukee, *Jeffrey S. Meyer* of Brookfield, *Michael A. Greene* of Milwaukee, *Jerome D. Okarma* of Milwaukee, and *Edwina A. Wilson* of Waukesha, for Wisconsin Manufacturers & Commerce, Milwaukee Transport Services, Inc., Harnischfeger Industries, Inc., Johnson Controls, Inc., Wisconsin Bell, Inc., and General Electric Medical Systems.

Before Sullivan, Fine and Schudson, JJ.

SULLIVAN, J. In this case we reaffirm the inveterate rule of law in Wisconsin that an employee is acting within the scope of his or her employment while

354

driving to or from work only if the employer exercises control over the method or route of the employee's travel. Consequently, we reject the trial court's ruling, which held as a matter of law that Wisconsin Electric Power Company was vicariously liable for the allegedly negligent actions of its employee, Michael T. Schmaling, while he drove from his home to a vocational training session held at Wisconsin Electric's central training center. The trial court ruled that "special circumstances" existed which excepted this case from the general employer-control test. In essence, the trial court adopted a "special mission" exception to the general rule; this exception is recognized in other jurisdictions. We hold that no such exception exists under Wisconsin law and that the summary judgment materials conclusively establish as a matter of law that Wisconsin Electric did not exercise control over Schmaling's route or method of travel, and thus was not vicariously liable for his alleged negligence. Accordingly, we must reverse the trial court's non-final summary judgment order and remand the matter for further proceedings consistent with this opinion.

## I. BACKGROUND.

Shortly before 7:00 a.m. in January 1993, Glenn DeRuyter was driving a tanker-truck filled with jet fuel in the center north-bound lane of Interstate 94 in Racine County. Schmaling, driving his Chevy Blazer at a speed of 75 to 80 miles per hour, was also traveling north from his home in Kenosha to a vocational training session that began at 7:00 a.m. at Wisconsin Electric's central training center in the City of West Allis. He attempted to pass DeRuyter's tanker on the right, but nearly struck a vehicle loaded with snowmobiles. Schmaling swerved farther to the right, onto the

snow and ice-covered highway shoulder, and then passed the vehicle hauling the snowmobiles. When he attempted to pull his Blazer back onto the highway, he lost control of his Blazer and spun around into the north-bound traffic lanes. DeRuyter's tanker jack-knifed and left the interstate, rolled down an embankment, and burst into flames—killing DeRuyter. The accident also caused significant property damage.

Schmaling's blood was tested shortly after the accident. The test recorded a .064 % blood alcohol content, and revealed trace amounts of marijuana and cocaine. He was criminally charged, convicted, and sentenced for one count of reckless homicide and four counts of second-degree recklessly endangering safety. *See generally State v. Schmaling*, 198 Wis. 2d 757, 543 N.W.2d 555 (Ct. App. 1995) (discussing criminal case against Schmaling).

Two civil suits arising out of this accident were commenced and later consolidated. In the first, DeRuyter's estate filed a wrongful death and survivorship action against, *inter alios*, Schmaling and his employer, Wisconsin Electric. In the second, JJ Transport, Inc., Power Transport, Inc., and DeRuyter's insurer, filed a negligence suit against Schmaling, his insurer, and Wisconsin Electric, seeking recovery for property damage caused in the accident.[1]

Both suits alleged that Schmaling was employed by Wisconsin Electric and was acting within the scope of his employment with the company when the accident occurred. Hence, the suits alleged that Wisconsin Electric was vicariously liable for Schmaling's conduct under the doctrine of *respondeat superior*.

---

[1] We refer to both sets of plaintiffs for the remainder of this opinion collectively as "DeRuyter's estate."

The suits alleged these additional facts. Wisconsin Electric hired Schmaling as a line mechanic in March 1992, and assigned him to Wisconsin Electric's Kenosha service center. When Wisconsin Electric hired him, the company advised him to report for his first day of work at Wisconsin Electric's training center in West Allis, and provided him with a general map of its location. (*See* appendix.) After completing his original training, he began working from the Kenosha service center. He was later informed by Wisconsin Electric that he had to attend a second mandatory training session in West Allis beginning in January 1993. As part of the training session, the employee needed to bring equipment to the training center. Schmaling attended the sessions in West Allis from January 4-7, 1993, by either driving himself to the center or by carpooling with other Kenosha-based employees.

Wisconsin Electric and Schmaling's union had a contract that provided a temporary transfer allowance for Wisconsin Electric employees assigned on a temporary basis to a location other than their regular work headquarters. Schmaling received this travel allowance for those days when he reported for work at the West Allis training center. The allowance was based on the distance between the Kenosha service center and the West Allis training Center in recognition of the employees' "additional round-trip automobile expense, mileage and travel time." Wisconsin Electric paid the allowance irrespective of whether the employee drove his or her own automobile, and regardless of how the employee arrived at the temporary work location.

Wisconsin Electric also had a "fitness-for-duty" policy governing its employees. The policy forbade Wisconsin Electric employees from consuming or being under the influence of alcohol "during the four hour

357

period preceding on duty time." The policy defined duty time as: "All time from the time an employee begins to work or is required to be in readiness to work." It was alleged in the pleadings that Schmaling had spent the night prior to the accident drinking beer in three Kenosha bars. He estimated that he drank "nine, ten beers, maybe a little more." He did not return home from the bars until after midnight, and then drank another beer before going to bed. After the accident, Wisconsin Electric fired Schmaling based, at least in part, upon his violation of the fitness-for-duty policy by being under the influence of alcohol within the four hours preceding work.

The parties filed cross-motions for summary judgment, each side focusing on the scope-of-employment issue. The trial court held as a matter of law that Schmaling was acting within the scope of his employment with Wisconsin Electric because the company: (1) directed him to attend the training center in the City of West Allis to which he was traveling at the time of the accident; (2) paid him an additional travel allowance to attend the session; (3) provided him with a map with general directions to the training facility; (4) mandated a "fitness-for-duty" policy, which prohibited Schmaling from consuming or being under the influence of alcohol during the four hours preceding his duty-time; and (5) primarily benefitted from Schmaling attending the training session. The trial court ruled that none of these factors taken separately would have been sufficient to place Schmaling's conduct within the scope of his employment, but taking the factors together, they created "sufficient special circumstances" that placed his actions within the scope of employment at the time of the accident. Accordingly, the trial court ruled as a matter of law that Wisconsin Electric was vicariously

liable for Schmaling's conduct. Wisconsin Electric petitioned this court for leave to appeal from the non-final order incorporating this ruling. We granted the petition.

## II. ANALYSIS.

"Summary judgment is appropriate to determine whether there are any disputed factual issues for trial and 'to avoid trials where there is nothing to try.'" *Caulfield v. Caulfield,* 183 Wis. 2d 83, 91, 515 N.W.2d 278, 282 (Ct. App. 1994) (citation omitted). When we review a motion for summary judgment we apply the same methodology as the trial court, but we do not accord the trial court's conclusion any deference. *Kotecki & Radtke, S.C. v. Johnson,* 192 Wis. 2d 429, 436, 531 N.W.2d 606, 609 (Ct. App. 1995). The methodology is oft repeated:

> [W]e first examine the pleadings to determine whether they state a claim for relief. If the pleadings state a claim and the responsive pleadings join the issue, we then must examine the evidentiary record to analyze whether a genuine issue of material fact exists or whether the moving party is entitled to judgment as a matter of law. Further, "[o]n summary judgment, we must draw all justifiable inferences in favor of the non-moving party, including questions of credibility and of the weight to accorded particular evidence."

*Bay View Packing Co. v. Taff,* 198 Wis. 2d 654, 674, 543 N.W.2d 522, 529 (Ct. App. 1995) (citations omitted).

The trial court ruled as a matter of law that Schmaling was acting within the scope of his employ-

ment with Wisconsin Electric. Normally, the scope-of-employment issue is presented to the jury because it entails factual questions. *See Desotelle v. Continental Casualty Co.,* 136 Wis. 2d 13, 26-28, 400 N.W.2d 524, 528-29 (Ct. App. 1986). Thus, for a trial court to rule on summary judgment that an employee was acting within the scope of his or her employment as a matter of law, there can be no genuine material factual dispute on this issue. After our *de novo* review of the summary judgment materials, we conclude that the trial court incorrectly applied the relevant scope-of-employment standards. We further conclude that the summary judgment materials conclusively establish that Schmaling was not acting within the scope of his employment with Wisconsin Electric when the accident occurred.

Under the doctrine of *respondeat superior* employers can be held vicariously liable for the negligent acts of their employees while they are acting within the scope of their employment. *Shannon v. City of Milwaukee,* 94 Wis. 2d 364, 370, 289 N.W.2d 564, 568 (1980).[2] The touchstone of scope-of-employment issues such as the one in the present case is employer control over the employee. *See Olsen v. Moore,* 56 Wis. 2d 340, 353-54,

[2] The doctrine is a bedrock of American tort law. *See, e.g., Philadelphia & Reading R.R. v. Derby,* 55 U.S. (14 How.) 468, 480 (1852) (" 'A master is ordinarily liable to answer in a civil suit for the tortious or wrongful acts of his servant, if those acts are done in the course of his employment in his master's service; the maxims applicable to such cases, being, Respondeat superior, ["Let the master answer."] and Qui facit per alium, facit per se ["He who acts through another, acts himself."].' " (citation omitted; bracketed materials added)); *see also* RESTATEMENT (SECOND) OF AGENCY § 219(1) (1957).

202 N.W.2d 236, 243 (1972). This employer-control test is firmly entrenched in Wisconsin jurisprudence. The general maxim is:

> Where an employee works for another at a given place of employment, and lives at home or boards himself, it is the business of the employee to present himself at the place of employment, and the relation of master and servant does not exist while he is going between his home and place of employment.

*Geldnich v. Burg,* 202 Wis. 209, 210, 231 N.W. 624, 624 (1930).[3] Thus, only when the employer exercises control over the method or route of the employee's travel to or from work can the employee be said to be acting within his or her employment. *See Kamp v. Curtis,* 46 Wis. 2d 423, 431-32, 175 N.W.2d 267, 271 (1970); *Strack v. Strack,* 12 Wis. 2d 537, 542, 107 N.W.2d 632, 634 (1961). This is the rule because without such control, the employee is not actuated by a purpose to serve the employer, *see Strack,* 12 Wis. 2d at 541, 107 N.W.2d at 633-34; *see also* RESTATEMENT (SECOND) OF AGENCY § 228(2) (1957) ("Conduct of a servant is not within the

---

[3] Indeed, one of the first statements of this maxim in Wisconsin was made in 1888: "The man who travels four rods to and from work . . . is no more in the employ of his master while so traveling than the one who travels four miles or further . . . ." *Ewald v. Chicago N.W. Ry.,* 70 Wis. 420, 436, 36 N.W. 12, 591, 592 (1888) (Taylor, J. dissenting). "[T]he courts have held that while going to and returning from the place of his employment after his day's work was finished and before it commenced again on the next working day, he was not in the employ of the master." *Id.* at 437-38, 36 N.W. at 593. The roots of this maxim are even older. *See, e.g., id.* at 438-39, 36 N.W. at 593 (discussing the Scottish common law case *Brydon v. Stewart,* which reached the opposite conclusion to the above rule and was overruled by the British House of Lords).

scope of employment if it is . . . too little actuated by a purpose to serve the master."), but is solely promoting the employee's "own convenience." *Strack,* 12 Wis. 2d at 541, 107 N.W.2d at 634.

DeRuyter's estate contends that "special circumstances" can exist that except an employee from the employer control rule. Indeed, the estate points to other jurisdictions that have adopted a "special mission" exception to the general rule that an employee is not acting within the scope of employment while traveling to and from work. *See, e.g., Chevron v. Lee,* 847 S.W.2d 354, 356 (Tex. Ct. App. 1993) (holding that a " 'special mission' exists when an employee is not simply traveling from his home to his normal place of employment, or returning from his normal place of employment to his home for his own purpose, but is traveling from his home or returning to it on a special errand either as part of his regular duties or at the specific order or request of his employer"). The estate then points to four factors that the trial court used in support of its ruling that Schmaling was acting within the scope of his employment with Wisconsin Electric. It argues that these factors support its contention that Schmaling was engaged in a "special mission" for Wisconsin Electric when the fatal accident occurred. We address these factors *seriatim.*

### A. Travel time compensation.

Schmaling's union-negotiated contract provided for travel-time compensation for employees temporarily assigned to other Wisconsin Electric job locations. Schmaling received this compensation for traveling to the West Allis training center. DeRuyter's estate argues that the travel time compensation was the

equivalent of exercising control over Schmaling and others to whom the allowance was paid. We disagree.

The determinative factor is employer control; here, the travel allowance signalled none. The negotiated contract provided compensation to employees for vehicular travel costs and time costs regardless of method of transportation the employee used. Indeed, Schmaling admitted that he would have received the compensation no matter how he travelled to the training center; and he received the allowance even though he carpooled. The law in Wisconsin is clear that the mere payment of an employee's travel cost vests no right of control with the employer, unless the employer exercises such control or retains the right to control the employee's route or method of travel. *Olsen,* 56 Wis. 2d at 353-354, 202 N.W.2d at 243 (union contract with employer requiring payment toward employee's transportation costs did not vest control in the employer for imposition of liability for employee's vehicular negligence). Here, the contract neither provided for such employer control, nor did Wisconsin Electric exercise control.

### B. Map.

DeRuyter's estate argues that Wisconsin Electric did control the route of Schmaling's travel by providing him with a map and by giving him directions over the phone on how to get to the center from Kenosha. It is undisputed that Wisconsin Electric did forward Schmaling a map of the West Allis training center when he was first hired. (*See* appendix.) This map, however, contains no directions. It merely depicts the layout of the training center, contiguous West Allis streets, and the location of Interstate-94 to the north of the center.

The trial court stated that the map, in part, established Wisconsin Electric's control over Schmaling's route of travel. We disagree. The map did not control the route of Schmaling's travel from Kenosha, it merely provided general directions to the center for employees unfamiliar with its location. Further, while Schmaling did call Wisconsin Electric for additional directions, the company did not mandate that he take a certain route. Schmaling was free to travel by any of many routes that led from Kenosha to West Allis. The fact Schmaling chose to travel on Interstate 94, the highway shown on the map, rather than by another route does not establish that Wisconsin Electric controlled that route.

*C. Fitness-for-duty policy.*

DeRuyter's estate also contends that Wisconsin Electric's "fitness-for-duty" policy evinces the company's right to control its employee's conduct, and that Wisconsin Electric did in fact exercise control over Schmaling when it fired him for violating the alcohol-prohibition provision. Once again, we disagree.

The policy, *inter alia*, prohibited Wisconsin Electric employees from either consuming or being under the influence of alcohol during the four hours preceding their duty-time.[4] Thus, DeRuyter's estate argues that

---

[4] The policy states in relevant part:

**Rules Regarding Illegal Drugs and Alcohol**

An employee who violates any of the following rules will be subject to disciplinary action up to and including discharge from employment with WE/WN.

A. An employee shall not use, possess, or be under the influence of illegal drugs while on duty.

by placing this condition on Schmaling's employment, Wisconsin Electric evinced a right to control Schmaling when he was traveling from his home to the training center. As the *amicus curiae* brief cogently points out, this argument is specious and contravenes sound public policy.[5] Alcohol and drug use cause myriad problems and dangers in the work place. Hence, there are salutary reasons for promoting a drug and alcohol-free work place, and thus, we will not expose employers to vicarious liability solely because they are pursuing this laudatory goal. The Wisconsin Electric "fitness-for-duty" policy attempts to limit the danger of an employee reporting to work in a hazardous condition. Such a policy is insufficient to trigger an employer's liability under *respondeat superior*.

### D. Remaining factors.

DeRuyter's estate finally argues that Schmaling was acting within the scope of his employment with Wisconsin Electric because his training in West Allis was mandatory and that Wisconsin Electric was the primary beneficiary of Schmaling's training. It is undisputed that Wisconsin Electric required Schmaling to attend the training session. This fact is insufficient to trigger vicarious liability in this case

---

B. An employee shall not use, possess, be under the influence of, or have any measured alcohol concentration or any detected presence of alcohol while on duty.

C. An employee shall not consume or be under the influence of alcohol during the four (4) hour period preceding on duty time.

[5] The *amicus* brief was filed on behalf of Wisconsin Manufacturers & Commerce; Milwaukee Transport Services, Inc.; Harnischfeger Industries, Inc.; Johnson Controls, Inc.; Wisconsin Bell, Inc.; and General Electric Medical Systems.

because it does not show any employer control over the method or route of Schmaling's transit to the training session. *See Strack,* 12 Wis. 2d at 542, 107 N.W.2d at 634. Further, even if Wisconsin Electric benefited from Schmaling's attendance at the training center, without evidence of Wisconsin Electric's right to control Schmaling's route and method of travel to that training session, *respondeat superior* does not apply. *See Kamp,* 46 Wis. 2d at 430-32, 175 N.W.2d at 270-71 (stating that even if the purpose of employee's trip was to benefit employer, without an employer's right to control the route and the instrumentality of travel, the employee was not acting within scope of employment).

### E. "Special mission" exception.

The trial court correctly stated that none of the above factors alone would place Schmaling's conduct within the scope of his employment with Wisconsin Electric. The trial court then inexplicably ruled that taking these factors together, the record established as a matter of law that Schmaling was acting within the scope of his employment—in essence creating a "special mission" exception to the long-standing employer-control test. We reject this analysis. As we have already discussed, none of the factors used by the trial court, standing alone, was sufficient to bring Schmaling's actions within the scope of his employment. Combining these factors adds nothing. "Zero plus zero equals zero." *Mentek v. State,* 71 Wis. 2d 799, 809, 238 N.W.2d 752, 758 (1976).

## III. Summary.

The trial court erred by ruling as a matter of law that Schmaling was acting within the scope of his employment with Wisconsin Electric. Our *de novo* review of the summary judgment materials conclusively establishes as a matter of law that Wisconsin Electric did not exercise control over Schmaling's route or method of travel, and thus was not vicariously liable for his alleged negligence. Accordingly we must reverse the non-final order and remand for further proceedings consistent with this opinion.

*By the Court.*—Order reversed and cause remanded with directions.

## APPENDIX
## WISCONSIN ELECTRIC POWER
## BLUEMOUND TRAINING CENTER
## 306 S. 116TH ST.
## WEST ALLIS, WI 53214
## 259-4168